# In the United States Court of Appeals for the Third Circuit

———————

ALEXANDER SMITH,

*Plaintiff-Appellant,*

v.

CITY OF ATLANTIC CITY; SCOTT EVANS, as Chief of the Atlantic City Fire Department; THOMAS J. CULLENY, JR., Deputy Chief of the Atlantic City Fire Department,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court for the District of New Jersey, No. 1:19-cv-06865
Hon. Christine P. O'Hearn

———————

**BRIEF OF THE NATIONAL COUNCIL OF YOUNG ISRAEL, THE ALEPH INSTITUTE, THE SIKH AMERICAN VETERANS ALLIANCE, AND RABBI JACOB GOLDSTEIN AS *AMICI CURIAE* IN SUPPORT OF APPELLANT ALEXANDER SMITH**

———————

Nicholas Reaves
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Penn. Ave. N.W.
Suite 400
Washington, D.C. 20006

Brian P. Morrissey
    *Counsel of Record*
Aaron P. Haviland
Drew K. Cypher
Mikayla Culbertson
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

April 10, 2024

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST**

*Amici curiae* the National Council of Young Israel, the Aleph Institute, and the Sikh American Veterans Alliance are nonprofit organizations and do not issue stock. Pursuant to Federal Rule of Appellate Procedure 26.1, the National Council of Young Israel, the Aleph Institute, and the Sikh American Veterans Alliance disclose that none has parent corporations, and no publicly held corporation owns 10 percent or more of the stock of any *amici*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF
  FINANCIAL INTEREST ....................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

INTERESTS OF *AMICI CURIAE* ....................................................1

SUMMARY OF ARGUMENT ............................................................3

ARGUMENT ......................................................................................5

I.    Failure to Accommodate Sincerely Held Religious Beliefs Regarding Facial
      Hair Threatens the Free Exercise Rights of Americans of Diverse Faith
      Backgrounds. ..............................................................................5

      A.    Facial Hair Is Important to Many Religious Groups' Sincerely Held
            Beliefs. ..............................................................................5

      B.    Increasing Discrimination Against Religious Minorities—and in
            Particular Growing Antisemitism—Underscores the Importance of
            Religious Beard Accommodations. .......................................9

II.   The United States Military Has Accommodated Religious Beards Despite
      Requiring Members to Be Fitted for Protective Respirators. ..........11

      A.    Military Grooming Standards Prohibit Members from Growing
            Beards. ..............................................................................12

      B.    Despite Longstanding Deference to Military Authorities, Courts Have
            Required the Military to Accommodate Religious Beards. .................13

      C.    The Military Has Employed Multiple Methods of Accommodation
            Without Incurring Undue Hardship.......................................15

III.  *Groff v. DeJoy* Significantly Altered the Legal Standard Applicable to Title
      VII Religious Accommodation Claims.........................................19

CONCLUSION ...................................................................................22

CERTIFICATE OF COMPLIANCE..........................................................................24

CERTIFICATE OF SERVICE ...............................................................................25

CERTIFICATE OF VIRUS SCAN .........................................................................26

CERTIFICATE OF BAR MEMBERSHIP...............................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page**

*Benjamin v. Coughlin*,
  905 F.2d 571 (2d Cir. 1990) ................................................................5

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ................................................................14

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ................................................................4, 19, 20, 21

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ................................................................5

*Orloff v. Willoughby*,
  345 U.S. 83 (1953) ................................................................13

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ................................................................13, 14

*Singh v. Carter*,
  168 F. Supp. 3d 216 (D.D.C. 2016) ................................................................14

*Smith v. City of Atl. City*,
  No. 1:19-CV-6865, 2023 WL 8253025 (D.N.J. Nov. 28, 2023),
  *appeal docketed*, No. 23-3265 (3d Cir. Dec. 28, 2023) ................................................................20

*Trans World Airlines, Inc. v. Hardison*,
  432 U.S. 63 (1977) ................................................................19

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ................................................................5

**Statutes**

42 U.S.C. § 2000e-2(j) ................................................................19

**Rules**

Fed. R. App. P. 29(a)(4)(E) ................................................................1

Fed. R. App. P. 29(a)(2) ................................................................1

## Other Authorities

ADL Ctr. on Extremism, *Audit of Antisemitic Incidents 2022* (Mar. 2023), https://perma.cc/YC8M-MJ8S ...........................................9, 10

Am. Jewish Comm., *The State of Antisemitism in America 2023: AJC's Survey of American Jews* (last visited Mar. 24, 2024) ...........................10

Army Regulation 600-20, Army Command Policy (July 24, 2020) ................12, 16

Army Regulation 670-1, Wear and Appearance of Army Uniforms and Insignia (May 25, 2021).........................................................................12, 13

Avon Protection, *FM50; The First Choice for Defense*, bit.ly/4amtTml (last visited Mar. 24, 2024).......................................................18

Becket, *Katsareas v. United States Navy*, bit.ly/493yoAA (last visited Mar. 24, 2024)............................................................................................17, 18

Becket, *Singh v. Berger*, bit.ly/43vPqGk (last visited Mar. 24, 2024)....................15

Michael Bressem, *Why the Orthodox Church Needs Deacons, Pemptousia* (Dec. 15, 2016), https://perma.cc/U7WK-XVB2 ...........................9

Jonathan A.C. Brown, *Muhammad: A Very Short Introduction* (2011)....................8

*Careers & Jobs*, U.S. Army, bit.ly/3IReONb ................................................................................16

Michele Chabin, *In Israel, Orthodox men demand beard-friendly gas masks*, Religion News Serv. (Aug. 28, 2013), bit.ly/43z5FCx .........................19

Arianne Cohen, *On the Rise in the U.S., Antisemitism Is Seeping into the Workplace*, L.A. Times (Jan. 11, 2023), https://perma.cc/9JBE-VM2T....................................................................................................................9

Ian Deitch, *Ancient Beard Traditions Shape the Face of Modern Jerusalem*, Assoc. Press (Feb. 16, 2018), bit.ly/4ajhsr2........................................5

Dep't of the Air Force Instruction 36-2903, Dress and Personal Appearance of U.S. Air Force and U.S. Space Force Personnel (Feb. 7, 2020)...................................................................................................13

Dep't of the Air Force Instruction 48-137, Respiratory Protection Program (Sept. 12, 2018) ............................................................. 13, 17

Dep't of Justice, *2021 Hate Crimes Statistics* (Feb. 14, 2023), https://perma.cc/NE8MEMEM ......................................................... 10

Vladimir Dolgikh, *Why Do Members of the Clergy Wear a Beard?*, The Catalogue of Good Deeds (Jan. 12, 2021), https://tinyurl.com/2r26v5je ...................................................... 8

3 *Encyclopedia Judica* (2d ed. 2007) ...................................................... 6

2 *The Encyclopaedia of Sikhism* (Harbans Singh ed., 2d ed. 2001) ..................... 7, 9

Sefer HatMitzvot, *Negative Commandments 44* (Rabbi Francis Nataf trans., Sefaria ed. 2021), bit.ly/3vefYPW (last visited Mar. 24, 2024) .............................................................................. 6

*The Holocaust Chronicle: A History in Words and Pictures* (2002), bit.ly/3xjgV9W .................................................................. 9

Larry Janssen, *What is a Positive Pressure Respirator?*, 15 3M Job Health Highlights 1 (1997) ...................................................... 19

Joint Chiefs of Staff, *Joint Publication 3-11, Operations in Chemical, Biological, Radiological, and Nuclear Environments* (Oct. 29, 2018) ......................................................................... 16

Robert P. Jones et al., *The 2020 Census on American Religion* 11 (2021), https://perma.cc/7GDU-BWXY (last visited Mar. 24, 2024) .............................................................................. 11

Mohammad Hashim Kamali, *Shari'Ah Law: An Introduction* (2008) ..................... 8

*Leviticus* 19:27 (New Revised Standard Version) ..................................... 6

*Leviticus* 21:5 (New Revised Standard Version) ..................................... 6

C. Todd Lopez, *Turbans, Beards, Dreadlocks now Permissible for Some Soldiers*, U.S. Army (Jan. 24, 2017), bit.ly/3xbocc8 ...................... 14

Stephen Losey, *Air Force Officially OKs Beards, Turbans, Hijabs for Religious Reasons*, Air Force Times (Feb. 11, 2020), bit.ly/4cxYEG7 ........................................................................14

W.H. McLeod, *The A to Z of Sikhism* (2005) ...........................................7

Orthodox Christian Info. Ctr., *Concerning the Tradition of Long Hair and Beards*, https://perma.cc/Z9KF-Y4VA (last visited Mar. 24, 2024) .....................................................................................8

Dave Philipps, *Sikhs Sue Marine Corps Over Restrictions on Beards*, N.Y. Times (Apr. 11, 2022), nyti.ms/3x5q465 ..................................12

Michael M. Phillips, *Why U.S. Troops Want to Stay in Afghanistan*, Wall St. J. (Oct. 25, 2013) ...................................................................17

Resume Builder, *1 in 4 Hiring Managers Say They Are Less Likely to Move Forward with Jewish Applicants* (Jan. 19, 2023), https://perma.cc/8EQ5-U3P6 .......................................................10, 11

Rachel C. Schneider et al., *How Religious Discrimination is Perceived in the Workplace: Expanding the View*, 8 Socius 1 (2022) ...............10

Patwant Singh, *The Sikhs* (1999) ...............................................................7

Sara K. Stadler, *Forging a Truly Utilitarian Copyright*, 91 Iowa L. Rev. 609 (2006) .................................................................................11

Cass R. Sunstein, *On the Expressive Function of Law*, 144 Univ. Pa. L. Rev. 2021 (1996) .............................................................................11

Opinderjit Kaur Takhar, *Sikh Identity: An Exploration of Groups Among Sikhs* (2005) .........................................................................7

Eliyahu Touger, *The Beard in Jewish Law: Halachic Imperative or Kabbalistic Stringency* (2010) .............................................................6

The National Council of Young Israel ("Young Israel") is a Jewish synagogue organization that provides resources and services to more than 100 synagogues and their more than 25,000 member families throughout the United States. Founded in 1912 as an attempt to address some of the difficulties facing American Orthodox Jews at the time, Young Israel seeks to advance Torah-true Judaism and promote the values of Judaism. It is committed to the principle that traditional faith is compatible with good citizenship.

The Aleph Institute is a nonprofit Jewish organization dedicated to assisting and caring for the spiritual wellbeing of members of specific populations who are isolated from the regular community, including U.S. military personnel across the globe. It addresses their religious, educational, and spiritual needs, advocates for their civil and religious rights, and provides support to their families. Since its founding in 1981, the Aleph Institute has grown from just one Rabbi to more than

---

[1] *Amici* state that no party's counsel authored this brief in whole or in part, and no party, its counsel, or any other person—other than *amici* or their counsel—contributed money intended to fund preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E). Counsel for Appellant consented to this filing. Counsel for Appellees stated that they took no position on requests for the filing of *amicus curiae* briefs in this matter and would leave those determinations to the Court. Accordingly, *amici curiae* have filed a motion contemporaneously with this brief seeking leave of the Court. *See id.* at 29(a)(2). This brief is prepared by a clinic operated by Yale Law School but does not purport to present the School's institutional views, if any.

65 dedicated staff members and over 500 volunteers who help countless individuals and families.

The Sikh American Veterans Alliance ("SAVA") is a nonprofit organization that promotes the core values of loyalty, unity, and selfless service that are intrinsic to both Sikhism and military service. It works to strengthen the United States military while supporting a larger American community of civil rights and religious freedom advocates. Its founder, Dr. Kamal Singh Kalsi, was the first Sikh American soldier in over a generation to receive an accommodation to the Army's uniform and grooming standard and was instrumental in ushering in the Army's and Air Force's historic changes to their religious accommodation policies in 2017 and 2020, respectively. SAVA recently helped secure a religious accommodation for a Marine Corps recruit who was initially denied entry due to his turban and beard.

Rabbi Jacob Goldstein is a former United States Army chaplain. The longest-serving Jewish Chaplain in the United States military, he retired as a Colonel after 38 years of service. Rabbi Goldstein served with distinction, deploying to Grenada, Operation Desert Storm, Operation Enduring Freedom in Afghanistan in 2002 and again in 2012, and Operation Iraqi Freedom. He was also mobilized as the Senior Chaplain at Ground Zero in response to the World Trade Center attack in 2001. As the chief chaplain for the New York Army National Guard, Rabbi Goldstein spent four and a half months at Ground Zero, tending to the spiritual needs onsite. He also

served as the Staff Chaplain for Hurricane Katrina relief and TWA Flight 800 recovery efforts. Rabbi Goldstein attended the Rabbinical College of Canada, where he received a degree in Religious Education, and the Lubavitch Rabbinical Seminary, where he received a Master of Divinity degree and became ordained as a Rabbi. During his entire career, Rabbi Goldstein wore a full-length beard, as required by his Jewish faith.

For many Orthodox Jews and Sikhs, as well as members of other faiths, maintaining a beard is critical to their religious practice. *Amici* are committed to promoting the religious liberty of all Americans. They believe that those individuals who maintain beards for religious reasons should be able to obtain reasonable accommodations from their employers.

## SUMMARY OF ARGUMENT

Religious beard accommodations are critical for Americans of varied faith backgrounds. Many Orthodox Jews believe that maintaining a beard is essential to their faith, as this practice is deeply rooted in Jewish history and tradition. For Sikhs, maintaining facial hair is a central tenet of their religion, and violation of this tenet is apostasy. Many Muslims also view maintaining a beard as essential to practicing *Sunnah*, the traditions and practice of following the Islamic prophet Muhammad. The same is true for various Christian sects. Beard accommodations are especially important today in light of increasing antisemitism in the United States. Protecting

the ability of religious minorities to wear the indicia of one's faith in public is a critical bulwark against discrimination—particularly discrimination in the workplace.

Moreover, the United States military demonstrates that an organization with a critical mission requiring its members to wear respiratory protection *can* accommodate religious beards. Each of the military branches has a baseline no-beard policy because of their interest in uniformity and the need for all members to wear a gas mask when threatened by toxic weapons. Despite these important interests and a longstanding history of judicial deference to military authorities, courts repeatedly have required that the military make reasonable accommodations for religious beards. For nearly a decade, several branches of the military have used these commonsense methods to enable religious exercise in the ranks without compromising their mission.

In denying Appellant Alexander Smith's religious accommodation request, the District Court failed to take proper account of these considerations and misapplied the new standard set out in *Groff v. DeJoy*, 600 U.S. 447 (2023). In *Groff*, the Supreme Court recognized that Title VII of the Civil Rights Act of 1964 imposes a heightened standard on employers to prove that an accommodation would create an "undue hardship." In its rush to summary judgment, the District Court considered

only one avenue of potential accommodation and failed to perform the context-specific burden analysis required by *Groff*.

## ARGUMENT

### I. Failure to Accommodate Sincerely Held Religious Beliefs Regarding Facial Hair Threatens the Free Exercise Rights of Americans of Diverse Faith Backgrounds.

#### A. Facial Hair Is Important to Many Religious Groups' Sincerely Held Beliefs.

Appellant Alexander Smith's beliefs about beards are "by no means idiosyncratic." *Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (referring to the ubiquity of beard requirements in Islam). Many religious belief systems subscribe to tenets that require beards. *See, e.g.*, *Warsoldier v. Woodford*, 418 F.3d 989, 991–92 (9th Cir. 2005) ("[Plaintiff's Native American religion teaches] that hair may be cut only upon the death of a close relative."); *Benjamin v. Coughlin*, 905 F.2d 571, 573 (2d Cir. 1990) ("fundamental tenet of the religion is that a Rastafarian's hair is not to be combed or cut"); Ian Deitch, *Ancient Beard Traditions Shape the Face of Modern Jerusalem*, Assoc. Press (Feb. 16, 2018), bit.ly/4ajhsr2 ("some Orthodox Jewish communities . . . consider facial hair so holy that men refrain from even combing their beards").

For example, many religious Jews believe that growing a beard is mandated by their faith. Maimonides's treatise *Sefer HaMitzvot* ("The Book of Commandments") states that a male Jew may not shave any of the five corners of

5

his beard. *See* Sefer HatMitzvot, *Negative Commandments* 44 (Rabbi Francis Nataf trans., Sefaria ed. 2021), bit.ly/3vefYPW (last visited Mar. 24, 2024). This command derives from the Book of Leviticus: "You shall not round off the hair on your temples or mar the edges of your beard." *Leviticus* 19:27 (New Revised Standard Version). Leviticus also directs priests "not [to] shave off the edges of their beards." *Leviticus* 21:5, *supra*. Significant segments of the Orthodox community interpret these verses to prohibit the removal of beards. *See* Eliyahu Touger, *The Beard in Jewish Law: Halachic Imperative or Kabbalistic Stringency* vi (2010) ("there is substantial basis to prohibit removing the beard by any means; this is the opinion of some of the greatest *halachic* luminaries over the course of Jewish history").

This interpretation is deeply rooted in Jewish history and tradition. The *Encyclopedia Judaica* notes that, "with the rise of Hasidism, the removal of the beard became tantamount to a formal break with Jewish tradition." 3 *Encyclopedia Judaica* 236 (2d ed. 2007) (citation omitted). Rabbi Jonathan Eyebschuetz, the chief rabbi of several prominent German Jewish communities and author of over 30 works of Jewish law, wrote that "one who removes his beard forfeits the image of G-d." Br. *Amicus Curiae* of the Nat'l Jewish Comm'n on L. & Pub. Affs. *et al.* in Supp. of Pet'r, *Holt v. Hobbs*, 574 U.S. 352 (2015) (No. 13-6827), 2014 WL 2465968, at *7 (quoting *Ya'aros Dvash, Drush* 15). Rabbi Yisrael Meir Kagan and Rabbi Avraham Yeshayahu Karelitz prohibited using shaving machines and strongly encouraged

untrimmed beards. *See id.* at \*7–8 (citing Touger, *supra*, at 39, 40, 43–51). Chabad-Lubavitch, one of the most well-known Hasidic Jewish communities today, scrupulously prohibits beard-trimming. *See id.* at \*9 (citing *Responsa of the Tzemach Tzedek* (1789–1865), *Yoreh Deah* sec. 93).

It is similarly central to the Sikh religion that adherents maintain *kesh*—uncut hair throughout the entire body. *See* Patwant Singh, *The Sikhs* 56 (1999). Guru Nanak, the founder of Sikhism, called this requirement "God's divine Will." Opinderjit Kaur Takhar, *Sikh Identity: An Exploration of Groups Among Sikhs* 30 (2005). Guru Gobind Singh, the tenth master of the Sikhs, codified *kesh* as a critical part of a Sikh's uniform and identity. *See id.* at 31. Sikhs face grave consequences for failing to maintain *kesh*: "Trimming or shaving is forbidden [for] Sikhs and constitutes for them the direst apostasy." *See* 2 *The Encyclopaedia of Sikhism* 466 (Harbans Singh ed., 3d ed. 2011). In fact, the cutting of *kesh* is one of four cardinal sins in the religion. *See* W.H. McLeod, *The A to Z of Sikhism* 119 (2005). This mandate reflects the teaching that God put meticulous thought into creating humans, and thus one should leave hair untouched to live in harmony with God. *See* 2 *The Encyclopaedia of Sikhism*, *supra*, at 466.

Many Muslims also believe that their faith commands them to maintain a beard. "Of the four major schools of Islamic law in Sunni Islam, three (Hanbali, Maliki, Hanafi) require a man to have a beard and the fourth (Shafi'i) at least

strongly recommends it." Br. of Islamic L. Scholars as *Amici Curiae* in Supp. of Pet'r, *Holt v. Hobbs*, 574 U.S. 352 (2015) (No. 13-6827), 2014 WL 2465964, at *17–18 (citing Ahmad Ibn Naqib Al-Misri, *Reliance of the Traveler: A Classic Manual of Islamic Sacred Law* 58 (Nuh Ha Mim Keller trans., 1991)). Muslims seek to comply with the *Sunnah*, or customs that emulate the life of the prophet Muhammad. They see the *Sunnah* as a sure path toward living a life that is pleasing to God. *See* Mohammad Hashim Kamali, *Shari'Ah Law: An Introduction* 20 (2008) (noting the assessment, a millennia ago, that "every single chapter of *fiqh* [law] finds its origin in the Qur'an, which is then explained and elaborated by the Sunnah"). Following "[T]he Prophet's persona is the earthly pivot of faith and Muslim communal identity." Jonathan A.C. Brown, *Muhammad: A Very Short Introduction* 105 (2011).

Keeping beards is important to many Christian believers as well. For example, Eastern Orthodox clergy wear beards to emulate the Old Testament priests and Christ. *See* Orthodox Christian Info. Ctr., *Concerning the Tradition of Long Hair and Beards*, https://perma.cc/Z9KF-Y4VA (last visited Mar. 24, 2024). This practice is deeply rooted in apostolic tradition, and statements suggesting that men should wear beards appear in the Sixth Ecumenical Council. *See* Vladimir Dolgikh, *Why Do Members of the Clergy Wear a Beard?*, The Catalogue of Good Deeds (Jan. 12, 2021), https://tinyurl.com/2r26v5je. Many of these Eastern Orthodox clergymen

work in secular professions in addition to performing their clerical duties. *See* Michael Bressem, *Why the Orthodox Church Needs Deacons*, Pemptousia (Dec. 15, 2016), https://perma.cc/U7WK-XVB2.

Historically, facial hair has been targeted as a way of attacking the beliefs and practices of religious minorities. Sikhs in the eighteenth century were persecuted by the Mughal Empire and often had their hair forcibly cut. *See* 2 *The Encyclopaedia of Sikhism*, *supra*, at 466. A beard was a Jewish insignia for centuries, and Nazis displayed their hatred of Jews through public humiliation rituals in which members of the SS forcibly cut Jewish men's beards. *See The Holocaust Chronicle: A History in Words and Pictures* 150, 173, 330, 376 (2002), bit.ly/3xjgV9W. The religious significance of facial hair and its connection to religious persecution make clear the need for legal protections and accommodations.

### B. Increasing Discrimination Against Religious Minorities—and in Particular Growing Antisemitism—Underscores the Importance of Religious Beard Accommodations.

Today, there is an unfortunate rise in antisemitism across the United States, and particularly in the workplace. *See* Arianne Cohen, *On the Rise in the U.S., Antisemitism Is Seeping into the Workplace*, L.A. Times (Jan. 11, 2023), https://perma.cc/9JBE-VM2T. In 2022, the Anti-Defamation League tracked 3,697 antisemitic incidents in the United States, a 36 percent increase from the previous year and the highest recorded in any year since 1979. *See* ADL Ctr. on Extremism*,*

*Audit of Antisemitic Incidents 2022*, at 5 (Mar. 2023), https://perma.cc/YC8M-MJ8S. According to the same study, 20 percent of Americans believe in six or more antisemitic tropes, almost double the number from 2019. *See id.* at 6. The Federal Bureau of Investigation's 2021 statistics on hate crimes report that Jews were the group most likely to be the victims of religiously motivated hate crimes. Dep't of Justice, *2021 Hate Crimes Statistics* (Feb. 14, 2023), https://perma.cc/NE8MEMEM. Furthermore, according to a 2023 survey conducted by the American Jewish Committee, 25 percent of American Jews report that they were the victim of antisemitic remarks or conduct in the past year. Am. Jewish Comm., *The State of Antisemitism in America 2023: AJC's Survey of American Jews*, bit.ly/3ITQwlT (last accessed Apr. 8, 2024).

Antisemitism is especially prevalent in the workplace. A 2022 study of 11,356 employees found that more than half of Jewish respondents reported being discriminated against while at work. *See* Rachel C. Schneider et al*.*, *How Religious Discrimination is Perceived in the Workplace: Expanding the View*, 8 Socius 1, 5 (2022). A targeted survey of 1,131 hiring managers found that 26 percent of those surveyed reported they would be less likely to hire a Jewish applicant. *See* Resume Builder, *1 in 4 Hiring Managers Say They Are Less Likely to Move Forward with Jewish Applicants* (Jan. 19, 2023), https://perma.cc/8EQ5-U3P6. The same percentage claimed they made assumptions about whether candidates were Jewish

based on physical appearance, while 29 percent reported that antisemitism is acceptable in their company. *See id.* One in four hiring managers also said they are less likely to move forward with Jewish applicants. *See id.*

Today, Americans are more likely than ever to encounter different religious beliefs and practices in the workplace. *See* Robert P. Jones et al., *The 2020 Census on American Religion* 11 (2021), https://perma.cc/7GDU-BWXY (last visited Mar. 24, 2024). How employers and colleagues react to diverse faith traditions—especially those of minorities—will depend in part on what the law requires. *See* Sara K. Stadler, *Forging a Truly Utilitarian Copyright*, 91 Iowa L. Rev. 609, 666 (2006) ("Law shapes culture. Law can elevate culture or pervert it."); Cass R. Sunstein, *On the Expressive Function of Law*, 144 Univ. Pa. L. Rev. 2021, 2043 (1996) ("A large point of law may be to shift social norms and social meaning."). Accordingly, the failure of the law to protect beard accommodations makes it more likely that bearded Jewish men—as well as bearded men of other faiths—will become the targets of discrimination in the workplace.

## II. The United States Military Has Accommodated Religious Beards Despite Requiring Members to Be Fitted for Protective Respirators.

Because of its high-risk, high-stakes mission to defend our country, the United States military shares striking similarities with fire departments. Members of both organizations serve the public, often at risk to their own personal safety. Both firefighters and military members work in teams, relying on the professionalism,

competence, and dedication of their fellow servicemen and women. Like many fire departments, the military restricts facial hair because its members must be able to wear protective respirators when facing a risk of exposure to toxic substances. Unlike the Atlantic City Fire Department, however, the United States military has managed to accommodate its personnel who believe they have a religious duty to grow a beard.

### A. Military Grooming Standards Prohibit Members from Growing Beards.

While each military service branch establishes its own dress and appearance regulations, all six branches have a baseline prohibition against members growing beards. The justifications for this policy are twofold.

First, the military requires that its members must be able to wear a gas mask when working under a risk of chemical, biological, radiological, or nuclear contamination. *See* Dave Philipps, *Sikhs Sue Marine Corps Over Restrictions on Beards*, N.Y. Times (Apr. 11, 2022), nyti.ms/3x5q465. According to military regulations, hair between the gas mask and the user's face can prevent a perfect seal and reduce the mask's effectiveness. *See, e.g.*, Army Regulation 600-20, Army Command Policy, at 188 (July 24, 2020) [hereinafter AR 600-20]. Recognizing that an adversary might use toxic weapons in a future conflict, the military branches have maintained blanket prohibitions against beards. *See, e.g.*, Army Regulation 670-1, Wear and Appearance of Army Uniforms and Insignia, at 6–7 (May 25, 2021)

[hereinafter AR 670-1]. Accordingly, all servicemembers who might deploy to a conflict zone are required to pass a test to prove they can achieve a good seal on a standard issue gas mask. *See, e.g.*, Dep't of the Air Force Instruction 48-137, Respiratory Protection Program, at 17 (Sept. 12, 2018).

Second, the military states that its beard prohibition stems from an interest in uniformity, unit cohesion, and good order and discipline. *See Singh v. Berger*, 56 F.4th 88, 98 (D.C. Cir. 2022). This justification undergirds the military's general dress and grooming standards. For example, the Air Force asserts that pride in one's appearance and uniform "enhances the esprit-de-corps essential to an effective military force." Dep't of the Air Force Instruction 36-2903, Dress and Personal Appearance of U.S. Air Force and U.S. Space Force Personnel, at 9 (Feb. 7, 2020) [hereinafter DAFI 36-2903]. Similarly, the Army cites proper uniform wear as a mark of professionalism and an indicator of esprit de corps and unit morale. *See* AR 670-1, at 1.

### B. *Despite Longstanding Deference to Military Authorities, Courts Have Required the Military to Accommodate Religious Beards.*

Courts have long deferred to the judgment of military authorities regarding the management of military personnel. The Supreme Court has stated that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian" and that courts must scrupulously avoid meddling in "legitimate [military] matters." *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953). Furthermore, the

Court has disclaimed competence in "[t]he complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force," which "are essentially professional military judgments." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Judicial deference to the military is based on the understanding that oversight of the armed forces is a role typically better suited for the political branches. *See id.*

Despite this solicitous posture, courts have enforced Congress's admonition that the military strike a balance between its unique needs and the religious exercise rights of servicemembers. *See, e.g.*, *Singh v. Carter*, 168 F. Supp. 3d 216, 219 (D.D.C. 2016). After courts reversed the denial of several religious accommodation requests, most military branches adopted exemptions from uniform standards for religious beards and certain other articles of faith. *See* Stephen Losey, *Air Force Officially OKs Beards, Turbans, Hijabs for Religious Reasons*, Air Force Times (Feb. 11, 2020), bit.ly/4cxYEG7; C. Todd Lopez, *Turbans, Beards, Dreadlocks now Permissible for Some Soldiers*, U.S. Army (Jan. 24, 2017), bit.ly/3xbocc8; DAFI 36-2903, at 148–53. While those policies give limited discretion to military commanders to deny exemptions, courts continue to scrutinize failures to accommodate requests for religious accommodation. Indeed, even during basic training, a period of service when the Marine Corps has argued that the interest in uniformity is at its apex, courts have ruled that the military has an obligation to

accommodate religious beards. *See Berger*, 56 F.4th at 93 ("Citing RFRA, . . . the Army, Navy, Air Force, and Coast Guard, as well as their training Academies, each accommodate the Sikh religious practices at issue here during both initial recruit training and military service."); *see also id.* at 98, 102, 110.

**C.** **The Military Has Employed Multiple Methods of Accommodation Without Incurring Undue Hardship.**

In the face of its compelling interests in uniformity and servicemember safety, the military has managed to accommodate religious beards without compromising its mission for nearly a decade. The military has done so by tailoring dress and appearance exemptions to individual circumstances. Several of these approaches are instructive for how the Atlantic City Fire Department could accommodate religious beards within the framework of Title VII.



Marine Captain Sukhbir Toor. Becket, *Singh v. Berger*, bit.ly/43vPqGk (last visited Mar. 24, 2024).

First, the military has waived shaving requirements when a member is unlikely to encounter a chemical, biological, radiological, or nuclear ("CBRN") risk based on his position or duties. *See, e.g.*, DAFI 36-2903, at 155 (sample beard approval memorandum). This duty-centric approach recognizes that while servicemembers fit into broad categories like Soldier, Sailor, Marine, and Airman, their day-to-day jobs and attendant hazards are highly varied. For example, the Army divides its workforce into over 200 career fields as varied as cannon crewmember, civil affairs officer, general surgeon, and infantryman. *See Careers & Jobs*, U.S. Army, bit.ly/3IReONb (last visited Apr. 8, 2024). Moreover, because duties and hazards are context-dependent even within career fields, the Army's policy is that a religious beard accommodation "will not affect a Soldier's assignment of [career field] or branch, duty location, or attendance at military schools." AR 600-20, at 188. Rather, the policy clarifies that the key impediment to accommodation is the risk of CBRN exposure. *Id.* For a commander to impose a gas mask requirement and to preclude accommodation, CBRN risk must be more than hypothetical. *See* Joint Chiefs of Staff, Joint Publication 3-11, Operations in Chemical, Biological, Radiological, and Nuclear Environments, at II-1–II-29 (Oct. 29, 2018) (describing military procedures for evaluating and mitigating CBRN risks). In recent conflicts, many military members have deployed to combat zones with extensive facial hair because the CBRN risk was low.



Marine in Kajaki, Afghanistan on Oct. 13, 2013. Michael M. Phillips, *Why U.S. Troops Want to Stay in Afghanistan*, Wall St. J. (Oct. 25, 2013).

Second, some military branches allow members with shaving waivers to qualify for protective mask wear if they can demonstrate that their beards do not inhibit the mask's effectiveness. The Navy, for instance, allowed a Muslim sailor to keep a beard while he was assigned to his ship's firefighting team during combat operations. *See* Becket, *Katsareas v. United States Navy*, bit.ly/493yoAA (last visited Mar. 24, 2024). The Air Force also allows airmen to qualify for gas mask wear despite facial hair growth if they can pass a fit test. *See* Dep't of the Air Force Instruction 48-137, Respiratory Protection Program, at 17 (Sept. 12, 2018).



Navy Mass Communication Specialist Third Class Leo Katsareas. Becket, *Katsareas v. United States Navy*, bit.ly/493yoAA (last visited Mar. 24, 2024).

The ability of the armed forces to accommodate religious beards is all the more noteworthy in light of the practical challenges associated with wearing a traditional military gas mask. The standard issue M50 gas mask has no air supply and relies entirely upon filtration and a good seal for protection. *See* Avon Protection, *FM50; The First Choice for Defense*, bit.ly/4amtTml (last visited Mar. 24, 2024). When a wearer breathes in, the pressure inside the mask is temporarily lower than the surrounding air; a poor seal on a military M50 gas mask thus will allow contaminated air to leak into the mask without passing through the filters. By contrast, the self-contained breathing apparatus frequently worn by firefighters offers superior protection by using supplied air to maintain a higher pressure within the mask than the surrounding environment. Because air moves from high pressure to low pressure, an imperfect seal ventilates air without allowing contaminated air into the mask. *See*

Larry Janssen, *What is a Positive Pressure Respirator?*, 15 3M Job Health Highlights 1, 1–3 (1997).[2]

### III. *Groff v. DeJoy* Significantly Altered the Legal Standard Applicable to Title VII Religious Accommodation Claims.

Title VII of the Civil Rights Act of 1964 protects the rights of religious employees in the workplace. Employers must provide religious accommodations unless doing so would create an undue hardship. 42 U.S.C. § 2000e-2(j). After Title VII's adoption, a number of courts held that employers could deny accommodation requests that imposed anything "more than a *de minimis* cost," often relying on language to that effect in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

In *Groff v. DeJoy*, the Supreme Court corrected this misunderstanding of Title VII. The Court held that "showing 'more than a *de minimis* cost' . . . does not suffice to establish 'undue hardship' under Title VII." *Groff*, 600 U.S. at 468. Instead, the Court explained, an undue hardship exists only when "a burden is substantial in the overall context of an employer's business." *Id.* In reaching this holding, the Court reasoned that "statutory interpretation must begin with, and ultimately heed, what a

---

[2] Although apparently not available for use in the United States military, the Israeli government has developed hooded gas masks that cover the entire head and allow Orthodox Jewish men to receive protection while keeping their beards. *See* Michele Chabin, *In Israel, Orthodox Men Demand Beard-Friendly Gas Masks*, Religion News Serv. (Aug. 28, 2013), bit.ly/43z5FCx.

statute actually says." *Id.* (cleaned up). The Court thus looked to the ordinary meaning of "undue hardship."

The Court further observed that "[i]n common parlance, a 'hardship' is, at a minimum, 'something hard to bear.'" *Id.* (citing *Random House Dictionary of the English Language* 646 (1966)). It also noted that "hardship" can further encompass "something that causes or entails suffering or privation," *id.* at 469 (quoting *Webster's Third New International Dictionary* 1033 (1971)), as well as "[e]xtreme privation; adversity; suffering," *id.* (quoting *American Heritage Dictionary* 601 (1969)). Turning to the meaning of "undue," the Court stated that "the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* (quoting *Random House Dictionary of the English Language*, *supra*, at 1547). The Court thus made clear that, to demonstrate undue hardship, "an employer must show . . . substantial increased costs." *Id.* at 470 (citing *Hardison*, 432 U.S. at 83 n.14).

In its decision in this case, the District Court failed to appreciate this sea change brought about by *Groff*. While it noted obliquely that "the Supreme Court recently held that 'showing "more than a *de minimis* cost," . . . does not suffice to establish "undue hardship" under Title VII,'" *Smith v. City of Atl. City*, No. 1:19-CV-6865, 2023 WL 8253025, at *7 (D.N.J. Nov. 28, 2023) (quoting *Groff*, 600 U.S. at 468), *appeal filed*, No. 23-3265, 2023 WL 8253025 (3d Cir. Dec. 28, 2023), the

District Court's application of this new standard failed to heed the Supreme Court's instruction. Rather than "tak[ing] into account all relevant factors in the case at hand" as *Groff* commands, 600 U.S. at 470–71, the District Court considered *only* whether Smith could utilize a self-contained breathing apparatus with a beard and generally whether a "typical fire department" would be unduly burdened by such an accommodation, *Smith*, 2023 WL 8253025, at *8.

The District Court's analysis was misguided and incomplete for two key reasons. First, at a minimum, the District Court should have recognized that summary judgment was inappropriate in light of the genuine disputes of material fact regarding the ability of the Atlantic City Fire Department to accommodate Smith's request. *See* Appellant's Opening Br. 31–36. Second, the District Court failed to account for the fact that Smith could have been accommodated in a variety of other ways. *Id.* at 28–31. The District Court's approach disregarded *Groff*'s teaching that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a *particular* possible accommodation or accommodations." 600 U.S. at 473 (emphasis added). Indeed, "[c]onsideration of other options" by an employer is "necessary." *Id.*

\* \* \*

The Atlantic City Fire Department's failure to accommodate Alexander Smith's religious exercise threatens the free exercise of Americans of diverse religious traditions. As the United States military has demonstrated in recent years, those individuals whose faith obligates them to grow beards need not face the stark choice of either serving their community or observing their religious requirements. Allowing the department to gloss over the demanding *Groff* standard with vague and nebulous assertions of safety issues would jeopardize the ability of religious minorities across the country both to follow the dictates of their faith and to participate fully in public life.

## CONCLUSION

For the foregoing reasons, and those stated by Appellant, this Court should reverse the judgment of the District Court and remand the case for further proceedings.

Date: April 10, 2024

Respectfully submitted,

*/s/ Brian P. Morrissey*

Brian P. Morrissey
  *Counsel of Record*
Aaron P. Haviland
Drew K. Cypher
Mikayla Culbertson
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

Nicholas Reaves

YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Penn. Ave. N.W.
Suite 400
Washington, D.C. 20006

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and the Rules of this Court, because it contains 4,679 words (as determined by the Microsoft Word word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Pursuant to Local Rule 31.1(c), the undersigned also certifies that the text of the electronic brief is identical to the text in the paper copies.

Date: April 10, 2024

*/s/ Brian P. Morrissey*
Brian P. Morrissey

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2024, a true and correct copy of the foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Brian P. Morrissey
Brian P. Morrissey

**CERTIFICATE OF VIRUS SCAN**

I hereby certify, pursuant to Local Rule 31.1(c), that a virus scan detection program has been run on the file of the electronic version of this brief and that no virus was detected. The virus detection program is Carbon Black Defense [v.3.4.0.887].

*/s/ Brian P. Morrissey*
Brian P. Morrissey

# CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), I hereby certify that I am a member of the Bar of this Court.

*/s/ Brian P. Morrissey*
Brian P. Morrissey